1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DONALD COLBURN,

                        Plaintiff,

        v.

CITY OF TACOMA, et al.,

                      Defendants.

CASE NO. C12-5211 BHS

MEMORANDUM OF DECISION
WITH FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND ORDER

## I. INTRODUCTION

In the early morning hours of January 15, 2010, Donald Colburn, after leaving a bar having had 10 screwdrivers in a four-hour period, was observed by two Tacoma police officers driving his car at a speed of 100 miles per hour, or more, for 12 blocks on a Tacoma city street that was lined with a mixture of business and residential properties. Unable to negotiate a left turn onto another street, Colburn intentionally performed a 180-degree spin maneuver and brought his car to stop. The officers soon arrived on the scene and, finding him behind the steering wheel refusing commands to exit the car, used reasonable and necessary force to remove a resisting Colburn from his vehicle to insure

that his reckless and highly dangerous conduct was over. Colburn contends that, during

the interaction, the officers fractured his arm in two separate places. Colburn brought this

civil rights lawsuit under 42 U.S.C. 1983 claiming that the officers used excessive force

to apprehend him in violation of his Fourth Amendment right to be free from

unreasonable seizures. Colburn bears the burden of proving his allegations by a

preponderance of the evidence, and the Court finds that he has clearly and utterly failed

to meet this burden. Therefore, the Court concludes that the officers' actions were

reasonable and Colburn's constitutional rights were not violated.

## II. DISCUSSION WITH FINDINGS OF FACT

In arriving at this verdict, the Court has considered the witnesses' relative

credibility and the quality of the memories of the witnesses. On the critical factual issues,

the Court finds that the witnesses' testimony only deviates on the issue of whether the

officers gave commands to Colburn to exit the vehicle and whether he, by his actions,

refused and resisted the officers' attempts to remove him from his vehicle. While neither

officer's memory is crystal clear as to every detail, the Court finds that each officer's

version of the facts was generally consistent with one another and that Colburn's memory

was seriously flawed as to several details.  In fact, Colburn even admitted that he was

intoxicated and should not have been driving that night.

The Court finds that the officers pulled up at least 15 feet behind Colburn's

vehicle, and not in front of his vehicle, as Colburn testified. The officers approached the

driver's side of the vehicle, observed the vehicle lurch forward a few feet (not just

nudged forward while being place in the park gear as Colburn claims) and gave Colburn

1   commands to turn off the car. While Colburn denies that the officers gave him any orders

2   to exit the vehicle, his ability to remember details was impaired and he may have been in

3   a state of shock from the high-speed maneuver he performed. After Colburn appeared to

4   fail to respond to the officers' initial commands, Officer Johnathan Hill opened the

5   driver's side door, found Colburn grabbing the steering wheel and directed him to exit the

6   vehicle. When Colburn failed to comply, Hill began to pry Colburn's left fingers off the

7   steering wheel while continuing to direct Colburn to step out of the car. Hill then grabbed

8   Colburn's left arm and was unable to pull Colburn out of the vehicle because Colburn

9   was still resisting. Hill then transferred Colburn's left arm to Officer Jacob Willard,

10  which allowed Hill to pry Colburn's right hand off the wheel. During this sequence of

11  events, Colburn defied repeated orders to step out of the vehicle and it took the strength

12  of both officers to pull a six-foot-two-inch and 240-pound Colburn out of the car.

13          After the officers removed Colburn from the vehicle, they proceeded to handcuff

14  him.  They placed him face down on the pavement in a position with his arms under his

15  body, which was a position perpendicular to the car (not parallel as Colburn claims). The

16  officers then attempted to pull Colburn's arms out from underneath his body, but Colburn

17  continued to resist in spite of numerous orders to stop resisting. The maneuver required

18  the officers to exert some force on Colburn's arms in order to place Colburn's hands

19  behind his back in the typical handcuff position.

20          After they handcuffed Colburn, the officers frisked him. Both officers denied that

21  Colburn was taken to the front of the car where he claims he lost his feet from under him

22

1   and hit the hood of the car.  After being frisked, Colburn was placed in the backseat of

2   the patrol car and transported to the police substation.

3        At the station, Colburn complained to the officers for the first time that his left

4   shoulder hurt. The officers called medical aid responders, and the responders came to the

5   station to attend to Colburn. The responders subsequently transported Colburn to a

6   hospital where he was treated before being taken to Pierce County jail for booking.

7        In addition to varying testimony as to the arrest, the Court finds other

8   discrepancies that demonstrate either intentional deceit or, more likely, Colburn's

9   impaired and terrible memory. Although Colburn told his examining physician that he

10  was pulled out of the car window, that story is no more credible than the story that he was

11  somehow pulled through and out of his seatbelt at the same time. It would appear to be

12  nearly impossible to pull a man his size out of a car window, and such a claim is less

13  probable considering how much easier it would have been to simply open the door and

14  pull him out of the vehicle, as the Court has found. Nor can there be any real possibility

15  that somehow the officers could have yanked that same body out of the seatbelt unless, of

16  course, either they unbuckled it or, more likely, it was never fastened in the first place.

17  The bruise on Colburn's right shoulder, which Colburn attributed to the shoulder harness

18  injuring him while the officers pulled him out of the vehicle, is far less likely than

19  Defendants' theory that Colburn struck the steering wheel while performing what

20  Colburn himself described as a "Dukes of Hazard" maneuver.

21       Further, by his own admission, Colburn's memory of the entire incident is faulty

22  and substantially missing. For example, he acknowledged that his deposition testimony

1    regarding medical aid responding to the scene was probably incorrect, which it most

2    certainly was. Moreover, he said that his "brain kind of shutdown" after he broke his arm,

3    he had no recollection of being removed from the car, that his memory was "fuzzy for a

4    few minutes" afterward, and that he had no memory of being on the ground. In light of

5    these impairments, Colburn surprisingly asserted on direct that he was laying face down

6    parallel to the car, which is a fact that is contradicted by both officers' testimony.

7    Another significant and astonishing defect in memory is reflected in his failure to

8    remember his call to an attorney at the police substation. Based on these considerations,

9    Colburn's testimony is given little credibility concerning the events immediately

10   surrounding his apprehension on Pearl Street on January 15, 2010. Conversely, the

11   officers' testimony was delivered credibly, consistently and ultimately was a more

12   sensible rendition of events.

13        With regard to Colburn's injuries, there was considerable testimony on different

14   theories of how Colburn's arm was broken. Colburn was convinced that his arm struck

15   the frame of the car when he was pulled out of the window (or door). Defendants theorize

16   that it occurred when he was on the pavement and actively resisting the removal of his

17   arms under his body for the purpose of placing him in handcuffs after orders to stop

18   resisting. The firm reality is that no one really knows which, if either, theory explains the

19   injury. Conceivably, the break could have occurred before the car ever came to rest while

20   Colburn was executing his "Dukes of Hazard" maneuver and experiencing a powerful

21   wrenching of his left arm through the torque of the steering wheel. Again, there is some

22   evidence that the maneuver caused a severe bruising of his right chest, which, if true, is

1   evidence of a violent stop after a high speed maneuver. While such a theory would be

2   mere speculation, the other theories also remain unproven.

3       The fact that Colburn suffered such a severe injury is regrettable, but there is no

4   evidence that the techniques used by the arresting officers was in violation of any

5   standards regarding the use of force. In fact, the officers' techniques were fully endorsed

6   by Detective Jeffrey Paynter, an instructor on use of force training for the Washington

7   State Law Enforcement Training Commission. Detective Paynter's review of the version

8   of the facts, as given by the officers and accepted by the Court, led to his conclusion that

9   the officers performed their duties while fully protecting Colburn's constitutional rights.

10  Detective Paynter also concluded that the officers used best practices in a situation

11  requiring necessary and reasonable force. Indeed, rather than being the cause of

12  Colburn's broken arm, they may have saved his life or the life of another by ending his

13  ride of terror that night.

14                          **III. CONCLUSIONS OF LAW**

15      In order to recover for a claim of excessive force, Colburn bears the burden of

16  showing that the force used was an objectively reasonable amount. In considering the

17  evidence, the Court must evaluate certain factors that are not limited to, but include, those

18  set out in *Graham v. Connor*, 490 U.S. 386 (1989)*, overruled on other grounds by*

19  *Saucier v. Katz*, 533 U.S. 194 (2001). The *Graham* factors include the crime's severity,

20  whether the detained person posed an immediate threat to the officer's safety, and

21  whether the subject was resisting arrest.

22

1    In this case, the Court begins with considering the severity of the offense. The

2    seriousness of the crime the officers witnessed could hardly be overstated. While the

3    conduct resulted only in a conviction of driving under the influence of alcohol, the fact

4    that no one, including Colburn himself, was killed or gravely injured is remarkable. It is

5    difficult to even imagine a vehicle traveling through this neighborhood at a speed of 100

6    mph. Therefore, the Court concludes that this factor weighs in favor of Defendants.

7    With regard to officer safety, Colburn's actions presented a serious concern to the

8    officers.  When the officers approached the vehicle, it was unknown whether the engine

9    was still running. But this is not a controlling fact because the officers testified that

10   Colburn's car lurched forward a few feet.  Moreover, Colburn was in the driver's seat and

11   was fully capable of starting the car, speeding off, and engaging in additional extremely

12   hazardous driving. The Court concludes that the safety of the officers and the public

13   remained at risk as long as Colburn remained behind the wheel of his car that night. The

14   officers' actions were eminently reasonable when they applied force to insure that

15   Colburn would no longer be in control of his car, which had been a dangerous weapon.

16   This is especially true in light of the fact that Colburn refused to voluntarily exit the

17   vehicle.  Therefore, the Court concludes that this factor weighs in favor of Defendants.

18   Finally, the record is abundantly clear that Colburn was resisting.  While it is

19   unclear whether Colburn was intentionally resisting or whether he failed to fully

20   comprehend what was occurring, it is clear that he used his considerable strength and size

21   to resist the officers' efforts in removing him. Colburn clearly and unmistakably failed to

22   remove his hands from the steering wheel by holding on firmly, which required Officer

1  Hill to pry both of Colburn's hands free from it.  Therefore, the Court concludes that this

2  factor also weighs in favor of Defendants.  Simply put, the weight of the evidence

3  supports the clear and unmistakable conclusion that the officers' actions were reasonable

4  under the circumstances.

5  **IV. ORDER**

6       Therefore, the Court concludes that the officers' use of force was reasonable and

7  ultimately finds for Defendants.  The Clerk shall issue a **JUDGMENT** for Defendants

8  against Colburn.

9       Dated this 10th day of June, 2013.

10

11

12  BENJAMIN H. SETTLE
   United States District Judge

13

14

15

16

17

18

19

20

21

22

ORDER - 8